UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Casey Stine, as Administrator of
The Estate of Ryan Groot, deceased,            Case No. 3:19-cv-904

          Plaintiff,

    v.                                        MEMORANDUM OPINION
                                            AND ORDER

Sandusky County, *et al.*,

          Defendants.

## I. INTRODUCTION

On April 27, 2017, Ryan Groot was found unconscious in his cell at the Sandusky County Jail, with a bedsheet tied around his neck and to a grate in the ceiling of his cell. Groot died from his self-inflicted injuries a few days later. Casey Stine, Groot's former girlfriend and the administrator of his estate, filed suit on behalf of Groot's estate and his seven children against Sandusky County, Ohio, the Sandusky County Sheriff's Department, Sheriff Chris Hilton, Sergeant Justin West, Deputy Christine Turner, Deputy Joseph Loucks, jail nurse Margaret (Peggy) Defibaugh, Captain Mark Fisher, and Chief Deputy Edward Hastings (collectively, "the Defendants"). Stine alleges the Defendants violated Groot's constitutional rights by failing to recognize signs that he was suicidal. The Defendants filed a motion for summary judgment. (Doc. No. 97). Stine opposed that motion, (Doc. No. 108), and the Defendants file a brief in reply. (Doc. No. 112).

Groot's death was undoubtably tragic and perhaps preventable, if the individual Defendants had more closely followed county policy and generally accepted jail standards. But the law requires more: that the Defendants' misconduct evinces a deliberate indifference to a clearly established constitutional right, leading to Groot's death. Because the record does not contain evidence establishing this necessary element, I must grant the Defendants' motion for summary judgment.

## II.     BACKGROUND

In 2016, Groot was living with Stine and their young daughter. Groot had a long history of substance abuse. (*See, e.g.,* Doc. No. 78 at 16; Doc. No. 87 at 11; Doc. No. 91-31 at 2). He sought treatment on several occasions but was unable to maintain his sobriety. (*See, e.g.,* Doc. No. 87 at 9, 11-12). One afternoon in December 2016, Stine came home from work one day to find their daughter crying in her highchair. (Doc. No. 78 at 16). She found Groot passed out after using drugs and told him he needed to move out until he got help for his drug addiction. (*Id.*).

Groot left the house but began using drugs with some friends. Not long afterwards, he was arrested on charges of theft, breaking and entering, and receiving stolen property, allegedly for robbing a gas station. After he was arrested, Groot convinced Stine to post bail so he could see his kids for Christmas and to talk with his attorney about getting placed into a drug rehabilitation facility. (*Id.*). Those efforts fell through after Groot continued using drugs and subsequently was arrested for failing to appear for a mandatory court appearance. (*Id.*). He was booked into the Sandusky County Jail on January 6, 2017, related to those charges. Groot had been in correctional institutions before, both as an adult and as a juvenile. (*See, e.g.,* Doc. No. 87 at 11-12; Doc. Nos. 91-29 and 91-30).

Intake procedures at the Sandusky County Jail include completion of a medical screening questionnaire. During previous periods of incarceration, Groot self-reported that he was receiving treatment for anxiety and bi-polar disorder. (Doc. No. 91-29 at 2; Doc. No. 91-30 at 1). In January

2017, he reported to a staff member at the jail that he had anxiety and occasionally heard voices but was not being treated for either. (Doc. No. 91-31 at 1-2). Groot was referred for an evaluation with Shaiem Hampton, a Licensed Professional Counselor ("LPC") and mental health therapist who worked with inmates pursuant to a contract with the jail.[1] (Doc. No. 94). Hampton evaluated Groot on January 25, 2017, and recommended he receive individual counseling and mental health services, as well as a psychiatric evaluation. (*Id.* at 11). Dr. Anupam Anil Jha evaluated Groot on March 29, 2017, and prescribed medication to treat Groot's bi-polar disorder, anxiety, and difficulty sleeping. (Doc. No. 96 at 30). While he was incarcerated, Groot periodically attended group counseling sessions Hampton provided at the jail. (Doc. No. 94 at 2).

On April 17, 2017, Groot pled guilty to receiving stolen property and remained detained in the jail while awaiting sentencing. After entering his plea, Groot expressed to Stine that he was relieved to learn he was likely to serve a shorter sentence than he originally anticipated. (Doc. No. 78 at 23). But, around this time, Groot and Stine's relationship began to deteriorate. The two argued about whether Groot would get help to address his addiction and to stay sober when he got out of jail, and whether Stine was sending Groot enough money to pay for personal items he needed to purchase at the jail. (Doc. Nos. 91-79 and 91-80).

There was another source of contention between Groot and Stine as well – Groot's alleged relationship with Nicole Massie, a woman whom he was with when he committed the offense that led to his 2017 incarceration. Groot wrote to and received letters from Massie while in jail. (Doc. No. 78 at 17). He asked others, including his sister Erica, not to tell Stine that he was talking with Massie. (Doc. No. 87 at 10). But Stine saw posts on Massie's Facebook page that made her suspect Groot might pursue a relationship with Massie when he was released from jail. (Doc. No. 78 at 31).

---

[1] Hampton also worked with Groot during at least some of Groot's prior periods of incarceration. (Doc. No. 94 at 2).

These posts and their other arguments led Stine to write Groot a letter in April 2017, in which she told Groot she could no longer be in a relationship with him because she was concerned about Groot's commitment to sobriety and to her.[2] (Doc. Nos. 91-41 and 91-76).

On April 25, 2017, Groot and Stine got into an argument about how much money Stine was giving Groot to purchase hygiene items and other personal property items at the jail and whether Groot could have gotten treatment for his drug addiction if he had gone to prison rather than staying in the jail. (Doc. No. 91-80). Groot denied he needed treatment and Stine said "[i]f you don't think that you need help[,] then we should stop talking." (*Id.* at 3). Groot then ended the phone call. (*Id.*).

The next day, Groot and Stine had another argument over the phone. Stine recalls they argued about Massie and that she told Groot, "until he figured his stuff out and he took [her] seriously[, they] were no longer going to talk and [she] was [going to] block him from [her] number." (Doc. No. 78 at 29). After this phone, Stine blocked Groot so Groot began calling Stine's place of employment. The jail's phone system provided a brief recording where an inmate could say their name to be announced when calling someone, but instead of stating his name, Groot sent Stine short messages, imploring her to turn on her personal cell phone and telling Stine he would keep calling her work until she answered. (*Id.*). Each time he called, Stine would decline to accept the call and hang up the phone. (*Id.*). This went on until Stine's office manager called the jail and told them to stop Groot from calling Stine's office.[3] (*Id.*).

---

[2] Stine could not recall exactly when she sent the letter but stated she and Groot had an argument during a phone call about the letter before he died. (Doc. No. 78 at 25).

[3] There is no contemporaneous record of this conversation, although Stine recalls Groot stopped calling after her office manager contacted the jail. Nicholas Kotsopoulos, a major with the Sandusky County Sheriff's Office who conducted the investigation into Groot's death, recorded this incident in a handwritten note during the course of his investigation. (Doc. No. 91-25).

4

Around 2:00 p.m. the following day, April 27, 2017, Hampton, the LPC who worked as a professional mental health counselor at the jail, was stopped by Groot in the hallway. Hampton recalls:

> Groot said he wondered if he could get in to see me for counseling. I recall that the Jail was in the midst of preparing to lock down inmates for a shift change at the time. I asked if Groot felt he was experiencing a crisis and if he thought he might be suicidal. Groot denied being suicidal, and said he wanted to talk. I asked Groot if it could wait until the next morning, and he responded that was fine. Groot told me he was asking for medication and the Jail was not giving it. He said the medication was "PRN", which I understood to refer to a medication which is taken on an as needed basis and not regularly scheduled. I responded "alright."

(Doc. No. 94 at 3).[4] Hampton reported Groot's medication request to Defibaugh before he left the jail. (*Id.*).

Shortly after this conversation, the jail conducted a routine medication distribution. Groot received two prescription medications at this time: Perphenazine, an antipsychotic medication he took three times a day, and Hydroxyzine, an antianxiety medication he took up to three times a day as needed. (Doc. No. 96 at 32-33). A few hours later, Groot requested the Hydroxyzine again, but was told he would need to wait until the next scheduled medication distribution at 8:00 p.m. (Doc. No. 91-27).

Loucks conducted the 8:00 p.m. medication distribution. (Doc. No. 86 at 6-8). Groot received Perphenazine and Doxepin (a once-daily medication) at this time, but he did not receive Hydroxyzine because it was not on the medication cart. (*Id.*; Doc. No. 91-33). Groot became upset and accused Loucks of withholding his medication. (Doc. No. 86 at 14). Loucks stated that ordinarily he would call the nurse if he was unable to find an inmate's medication but acknowledged he likely did not do so on this occasion. (*Id.*). It is unclear from the record why Groot did not receive the medication, as Defibaugh had ensured earlier that morning that there was sufficient

---

[4] It is unclear to which medication Groot was referring through the use of the letters PRN.

5

medication on the cart for the inmates in Groot's wing of the jail for several days. (Doc. No. 85 at 12). Sara Root, another sheriff's deputy working on the evening of April 27, observed the interaction between Loucks and Groot but did not notice if Groot was frustrated or anxious during the discussion about his medication. (Doc. No. 81 at 11).

Later that night, Groot asked the other inmates in his cell block if they knew the time. Two inmates, Thad Spencer and Destery Jones, told Groot it was 10:45 p.m. (*See, e.g.,* Doc. No. 82 at 9). Shortly before 11:00 p.m., Deputy Michael Showman was conducting rounds in the cell block to which Groot was assigned. (Doc. No. 91-14 at 2). When he looked into Groot's cell, he saw Groot facing away from the cell door with a bed sheet wrapped around his neck and tied to an air vent in the ceiling. (Doc. No. 82 at 6). Showman called to the control room to have Groot's cell door opened. Once the door was opened, he entered the cell and attempted to lift Groot up while calling for assistance. (*Id.*). Root arrived shortly thereafter and used a knife to cut the sheet. (*Id.* at 7). Showman laid Groot on the ground, and Root began chest compressions. West, the sergeant responsible for that cell block, arrived with an automated external defibrillator ("AED"). Root and Showman set up the AED, but the machine indicated they should not shock Groot's heart. (*Id.* at 7-8). They continued chest compressions until paramedics arrived. (*Id.* at 8). Groot was transported first to the Fremont Hospital and then to the Toledo Hospital, where he died from his injuries on April 30, 2017. (Doc. No. 91-23 at 5).

Groot had written his own letter prior to his death, accusing Stine of seeing someone else and trying to avoid him. (Doc. No. 91-81 at 3). In the envelope, Groot enclosed a ripped-up Valentine's Day card Stine sent to him while he was in jail. Groot gave the letter to another inmate, Rory Sipperly, and asked him to mail it the following morning. (Doc. No. 90 at 6). Stine recalls she received the letter in the mail on the day Groot died after being removed from life support. (Doc. No. 78 at 33).

In his letter, Groot wrote "[g]uess I'll pull a Jason but I will succeed[,] promise that[,] hope you enjoy." (Doc. No. 91-81 at 1). This reference was apparently to Groot's brother Jason, who attempted to commit suicide in the Seneca County jail previously. (Doc. No. 87 at 13-14). Groot's sister Erica recalled that Groot believed Jason did not intend to commit suicide, but that he engaged in the attempt in order to be transferred to a less restrictive facility. (*Id.*). Sipperly testified that, when Groot gave him the letter to mail, he asked Groot why he could not mail it himself. (Doc. No. 90 at 6). Groot allegedly told Sipperly he would be in Toledo, which Sipperly understood to be a reference to the Northwest Ohio Psychological Hospital ("NOPH"). (*Id.*). Groot previously told Sipperly that his brother attempted suicide with the intention of being caught so that he could be transferred to NOPH, where he would have fewer restrictions and more privileges than in jail. (*Id.* at 9).

Two years after Groot's death, Stine filed suit as the Administrator of Groot's estate. She asserts four claims: (1) a § 1983 claim for deliberate indifference against all Defendants to Groot's serious medical needs in violation of the Fourteenth Amendment; (2) a § 1983 claim for failure to train against Sandusky County, the Sandusky County Sheriff's Department, Hilton, Hastings, and Fisher; (3) a state-law negligence claim; and (4) a state-law claim for intentional infliction of emotional distress. (Doc. No. 1 at 11-16). Defendants seek summary judgment on all of these claims on the basis of qualified immunity and immunity under Ohio law. (*See* Doc. No. 97).

### III. STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is

7

genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV.  ANALYSIS

#### A.  DELIBERATE INDIFFERENCE

In Count I, Stine asserts the individual Defendants were deliberately indifferent to Groot's serious mental health and medical needs when they failed to notice signs that Groot was suicidal, and failed to prevent his suicide, in violation of the Fourteenth Amendment.[5] (Doc. No. 1 at 11-12 and Doc. No. 108 at 29-30). Defendants assert they are entitled to judgment in their favor on this claim pursuant to the affirmative defense of qualified immunity, (*see* Doc. No. 97-1 at 40-42), and argue Stine has failed to carry her burden of establishing a genuine issue of material fact as to that affirmative defense. (*See* Doc. No. 112 at 24).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). There are two parts to the qualified immunity inquiry: (1) do the facts show a violation of a constitutional right, and (2) was that constitutional right "'clearly established' at the time of [the] defendant's alleged misconduct?" *Pearson*, 555 U.S. at 232. Courts have the discretion to consider either one of these two analytical parts first "in light of the circumstances in the particular case at hand." *Id.* at 236.

---

[5] Though Stine alleges the Defendants' conduct violated the Fifth and Eighth Amendments as well, (Doc. No. 1 at 11), it is the Fourteenth Amendment that protects a pretrial detainee's right to constitutionally adequate medical treatment, through application of the Eighth Amendment to the States. *See, e.g., Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482 (6th Cir. 2020). Because Groot had not been sentenced at the time of the incident, he was a pretrial detainee.

The Constitution protects a pretrial detainee's right to adequate medical treatment. Jail officials violate that right if they act with deliberate indifference to the detainee's serious medical needs. *See, e.g., Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482 (2020). The "deliberate indifference" standard has an objective and a subjective component. *See, e.g., Downard for Est. of Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020).

The objective component requires the plaintiff to show a pretrial detainee had "a 'sufficiently serious' medical need." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A detainee's "[p]sychological needs may constitute such 'serious medical needs[,]' particularly when those psychological needs 'result in suicidal tendencies.'" *Id.* (quoting *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)). "'[A]mple case law teaches that deliberate indifference toward a detainee's suicidal tendencies is a violation of Constitutional rights.'" *Moderwell v. Cuyahoga Cnty., Ohio*, 997 F.3d 653, 665 (6th Cir. 2021) (quoting *Linden v. Washtenaw Cnty., Mich.*, 167 F. App'x 410, 425 (6th Cir. 2006)).

But the Sixth Circuit has "held that 'the generalized right of a prisoner to be free from deliberate indifference [to a known serious medical need] cannot support a finding that there was a clearly established right to be protected from committing suicide.'" *Perez v. Oakland Cnty., Mich.*, 466 F.3d 416, 429 (6th Cir. 2006) (quoting *Rich v. City of Mayfield Heights, Ohio*, 955 F.2d 1092, 1096-97 (6th Cir. 1992)) (alteration by *Perez*). *See also Troutman*, 979 F.3d at 482 (noting inmates "do not have a guaranteed Eighth Amendment right to be screened correctly for suicidal tendencies") (citation and internal quotation marks omitted). In cases like this one, "a plaintiff meets the objective component of the Eighth Amendment analysis by demonstrating that the inmate exhibited suicidal tendencies during his or her detention or that he posed a strong likelihood of another suicide attempt." *Grabow v. Cnty. of Macomb*, 580 F. App'x 300, 307 (6th Cir. 2014) (citation and internal quotation marks omitted).

9

Stine offers two theories on what occurred prior to Groot's death. One theory is Groot wanted to be transferred to a facility with fewer restrictions and more privileges, and he came up with a plan to be discovered by officers while attempting to commit suicide so that he could be moved out of the jail. (Doc. No. 78 at 33-34). The second theory is that Groot was genuinely suicidal, and the individual Defendants ignored Groot's requests for his anxiety medication and his allegedly "erratic and uncharacteristic behavior." (Doc. No. 108 at 35). Only the second theory arguably establishes a serious medical need protected by the Constitution, and that is the assumed basis for the objective component of the qualified immunity inquiry. *See Perez*, 466 F.3d at 423 ("A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'") (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004)).

Defendants are entitled to qualified immunity as to Count I because, even if I assume Stine has shown Groot had a sufficiently serious medical need, the record does not demonstrate that any of the individual Defendants "knew of [this] serious medical need and that, despite this knowledge, [they] disregarded or responded unreasonably to that need," sufficient to satisfy the subjective component. *Downard*, 968 F.3d at 600 (citing *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

Until recently, the subjective component of the deliberate indifference inquiry in the Sixth Circuit has "require[d] that an official who actually knew of the serious medical need possessed a sufficiently culpable state of mind in denying medical care." *Perez*, 466 F.3d at 424 (citation and internal quotation marks omitted). As the parties note, the state-of-mind standard applicable to the subjective component of a pretrial detainee's deliberate indifference claim is in a state of flux. *See, e.g., Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585, 591 (6th Cir. 2021); *Trozzi v. Lake Cnty., Ohio*, 29 F.4th 745 (6th Cir. 2022); *Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305 (2023). These cases, following

10

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015), grapple with the question of whether the proper standard is actual knowledge or recklessness. *See, e.g., Helphenstine*, 60 F.4th at 315-16.

Stine has requested leave to file a sur-reply to Defendant's summary judgment motion to "address significant changes in the law which is still evolving." (Doc. No. 117 at 2). But, for this case,[6] it ultimately does not matter whether the correct standard is the "official's actual knowledge of the relevant circumstances," *Trozzi*, 29 F.4th at 755, or whether "each defendant 'acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Helphenstine*, 60 F.4th at 317 (quoting *Brawner*, 14 F.4th at 596) (further citation and quotation marks omitted). Stine has not produced sufficient evidence to identify a genuine dispute of material fact as to the subjective component, even under the lower recklessness standard.

In order to satisfy the subjective component, "'it is not enough to establish that an official may have acted with deliberate indifference to some *possibility* of suicide, or even a *likelihood* of suicide; the test is a *strong likelihood* of suicide.'" *Downard*, 968 F.3d at 601 (quoting *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 336 (6th Cir. 2013)) (emphasis in *Galloway*). *See also Barber v. City of Salem, Ohio*, 953 F.2d 232, 239-40 (6th Cir. 1992) (holding "the proper inquiry . . . for a jail detainee's suicide is: whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs."). "This is a high bar and typically requires evidence that the inmate was already on suicide watch, previously attempted suicide under similar conditions, or recently expressed a desire to self-harm." *Downard*, 968 F.3d at 601.

---

[6] Thus, while I appreciate the parties' offers to tackle a subject that has continued evolving in the months since Stine filed her motion for leave, I conclude further briefing on this issue would not affect the outcome of Defendants' motion and deny the motion for leave to file a sur-reply.

11

There is no evidence of the first two types of evidence identified in *Downard*, as there is no indication Groot had been placed on suicide watch or previously attempted suicide. Indeed, Groot himself previously and repeatedly denied having thoughts of suicide or having previously attempted to harm himself. (*See, e.g.,* Doc. No. 91-31; Doc. No. 94 at 3).

Stine seeks to defeat Defendants' motion through the third type of evidence, arguing there is a genuine dispute of material fact regarding the subjective component because Groot made comments about harming himself to other inmates, including Spencer and Jones, prior to his death and those comments were reported to a corrections officer. (*See, e.g.,* Doc. No. 108 at 36-37). Indeed, it is true that immediately after Groot was found in his cell, Spencer told Showman that Spencer had reported to an officer earlier that night that "Groot had made comments [to other inmates] that he was going to hang himself tonight." (Doc. No. 91-14 at 1). But it is also true that Spencer refused to divulge the name of the officer to whom he allegedly relayed this information, and there is no evidence in the record that Spencer had this alleged conversation with one of the individual Defendants.[7]

Stine makes two other arguments. The first is that jail policies regarding population counts and cell checks were repeatedly violated, including on the night of April 27, and that, if the individual Defendants had followed those policies, they would have discovered Groot's actions in time to prevent his suicide attempt. (*See, e.g.,* Doc. No. 108 at 40-41); (*see also id.* at 18-21 and 23-26). But "[a]lone, the failure to follow an internal policy does not give rise to a deliberate indifference claim." *Helphenstine,* 60 F.4th at 322 (citing *Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554, 578 (6th Cir.

---

[7] Further, while Stine suspected someone at the jail saw Groot's letter to her before it was mailed (because the envelope was taped shut), (Doc. No. 78 at 35), there is no evidence that any of the individual Defendants were aware of Groot's letter to Stine or any of its contents prior to Groot's death. Moreover, Sipperly testified he did not know what the letter said, and that Groot gave it to him on April 27, 2017, to mail out the following day. (Doc. No. 90 at 6).

2020)); *see also Barber*, 953 F.2d at 240 (holding failure to comply with state law is not evidence of deliberate indifference).

Moreover, speculation that adherence to training may have prevented Groot's death does not establish deliberate indifference. *Linden*, 167 F. App'x at 417 (6th Cir. 2006). Stine must show there is evidence of a strong likelihood that Groot would commit suicide before the sufficiency of the Defendants' knowledge of and efforts to prevent those actions becomes relevant. *Barber*, 953 F.2d at 239-40.

Stine's second argument is that the individual Defendants should have recognized Groot was at an increased risk of suicidal behaviors because, among other things, he became upset after he did not receive a prescribed anxiety medication and he had received bad news when Stine ended their relationship and blocked his phone calls. (Doc. No. 108 at 32-35).

But the Sixth Circuit has held that evidence such as this amounts to, at most, an "undefined risk" that an inmate may commit suicide. *Downard*, 968 F.3d at 601. An inmate's "[d]espondency . . . even if coupled with other stressors like drug withdrawal, does not itself lead to a 'strong likelihood' of suicide, <u>at least if the inmate expressly denies feeling suicidal</u>." *Troutman*, 979 F.3d at 483 (quoting *Barber*, 953 F.3d at 239-40) (emphasis added). As I noted above, Hampton asked Groot whether he "was experiencing a crisis and if he thought he might be suicidal" a few hours before Groot was found in his cell, and Groot said he was not. (Doc. No. 94 at 3).

The record does not contain evidence that there was a strong likelihood Groot would commit suicide and, therefore, Stine has not met her burden to show Groot's constitutional rights were violated and to overcome Defendants' qualified immunity defense. Therefore, the individual Defendants are entitled to qualified immunity on Stine's deliberate indifference claim.

13

### B. REMAINING CLAIMS

Defendants also are entitled to summary judgment on Stine's § 1983 failure to train claim. "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986)). *See also City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.").

Finally, Defendant argue they are entitled to statutory immunity under Ohio law as to Stine's state-law claims for negligence and intentional infliction of emotional distress. (*See, e.g.,* Doc. No. 97-1 at 60-61). I conclude the Defendants are immune from Stine's state law claims pursuant to Ohio Revised Code § 2744.03(A)(6) and § 2744.02(B). *See Downard*, 968 F.3d at 602-03 (holding qualified immunity analysis applies to state law immunity defenses based upon the same material facts), and *Chesher v. Neyer*, 392 F. Supp. 2d 939, 958 (S.D. Ohio 2005) (citing *Wilson v. Stark Cnty. Dep't of Human Serv.*, 639 N.E.d2 105, 107 (Ohio 1994)).

### V. CONCLUSION

For the reasons stated above, I grant Defendants' motion for summary judgment, (Doc. No. 97), and deny Stine's motion for leave to file a sur-reply. (Doc. No. 115).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge